UNITED STATES of America,

v.

John F. "Duffy" CONLEY, William C. Curtin, Sheila F. Smith, John Francis "Jack" Conley, Thomas "Bud" McGrath, Mark A. Abbott, Thomas Rossi, William Steinhart, Roberta Fleagle, Robin Spratt, Monica C. Kail, William J. Reed, Joanne T. Smith, Kenneth "Ron" Goodwin, Lawrence N. "Neudy" Demino, Sr., Christopher "Chris" Kail, Joseph A. Devita, Frank Garofalo, Thomas D. Ciocco, Michael Sukaly, Phillip M. "Mike" Ferrell, Anestos "Naz" Rodites, and William E. Rusin, Defendants.

Crim. No. 91–178.

United States District Court, W.D. Pennsylvania.

June 1, 1994.

Frederick W. Thieman, U.S. Atty., W.D.Pa., James R. Wilson, Asst. U.S. Atty., William D. Braun, Crim. Div., U.S. Dept. of Justice, Washington, DC, for plaintiff.

James Wymard, William Difenderfer, Anthony Mariani, Ellen Viakley, Gary Gerson, Caroline M. Roberto, Joel Johnston, Stanley Greenfield, Martha Bailor, Ray Radakovich, Carmen Martucci, Lee Markovitz, Edward J. Osterman, William Acker, Foster Stewart, Joseph Kanfoush, Carl Max Janavitz, Raymond M. Maloney, John Goodrich, Gary B. Zimmerman, Vincent Baginski, John Zagari, Pittsburgh, PA, for defendants.

## MEMORANDUM OPINION

LEE, District Judge.

## INDEX

INTRODUCTION ........................................................... 1036
SEIZURE AND SEARCH OF VIDEO POKER MACHINES .................. 1037
  Factual Background ................................................... 1037
    The State Warrants .............................................. 1037
    The City of Pittsburgh Affidavits ............................. 1040
  Discussion ........................................................... 1040
    Request for Franks Hearing ..................................... 1040
      The State Affidavits ......................................... 1041
      The Boilerplate Conclusion ................................... 1041
      The Mobility of the Machines ................................. 1043
      Materiality .................................................. 1043

The City of Pittsburgh Affidavits ........................................1046
**Conclusions of Law**.................................................1046
3100 WINDGAP AVENUE ..............................................1046
  **Findings of Fact**................................................1046
    "Standing" .....................................................1046
    Execution of the Search Warrant ....................................1047
    Summary of the Affidavit..........................................1047
  **Discussion** ....................................................1049
  **Conclusions of Law** ............................................1051
APPENDIX A
  SEPTEMBER 1988 STATE POLICE SEARCH WARRANTS...................1051
APPENDIX B
  SEPTEMBER 1988 CITY OF PITTSBURGH POLICE SEARCH WARRANTS...1052
APPENDIX C
  NOVEMBER 1988 STATE POLICE SEARCH WARRANTS .................1055
APPENDIX D
  DECEMBER 1989 CITY OF PITTSBURGH POLICE SEARCH WARRANTS...1055
APPENDIX E
  JANUARY 1989 STATE POLICE SEARCH WARRANTS.....................1055
**ORDER OF COURT** .................................................1055

## INTRODUCTION

In prior proceedings, the Court ruled that Defendant John F. "Duffy" Conley ("Duffy Conley") had Fourth Amendment interests that were implicated by seizures and searches of video poker machines from "locations"—bars, delicatessens, coffee shops, etc.—in which Duffy Conley had no reasonable expectation of privacy. *United States v. Conley,* 856 F.Supp. 1010, 1014–1022 (W.D.Pa.1994) (Document No. 801). Specifically, the Court held that Duffy Conley's ownership of the video poker machines, which the Court assumed for purposes of its decision, was an interest protected from unreasonable seizures by the Fourth Amendment. *Id.* at 16, 18, 23, 856 F.Supp. at 1019, 1020, 1022. The Court indicated that although the Fourth Amendment does not require a warrant to seize property in an unprotected area, it does require probable cause to seize without a warrant. The Court presumed that the Government would attempt to show probable cause to seize the machines through the warrants that were in fact issued for the eighty-odd locations. *Id.* at 18, 856 F.Supp. at 1020 & n. 7. Further, the Court held that Duffy Conley had a reasonable expectation of privacy in the inside compartments of the video poker machines, *id.* at 16, 19–22, 23–24, 856 F.Supp. at 1022, 1020–1022, 1019, necessitating a valid warrant or warrant-exception before the compartments properly could be invaded by law enforcement personnel.[1]

Duffy Conley and the Government subsequently stipulated that Duffy Conley, if called, would testify as to his ownership of video poker machines at specific locations and the Government possessed no evidence to contrary. See Document No. 826. The eighty-one challenged raids are listed by date, law enforcement organization primarily involved and location in the Appendices to this Memorandum Opinion.

Before the Court are the September 23, 1988 seizures and subsequent searches of video poker machines pursuant to the eighty-one warrants authorizing searches of locations.[2] Also before the Court is Duffy Conley's challenge to the September 23, 1988 search of 3100 Windgap Avenue.

As to the warrants authorizing searches of locations, Duffy Conley avers probable cause to search the locations is lacking within the

---

1. No Defendant proffered any evidence relating to reasonable expectations of privacy in the nonpublic areas in locations that were searched. Thus, the only aspect of the seizures and searches that are subject to challenge are the seizures of video poker machines and subsequent searches of the video poker machines.

2. Except for the warrants, the Government has introduced no evidence of probable cause to seize the video poker machines.

four corners of the affidavits in support of the warrants. He also contends he is entitled to a *Franks* hearing because he has made a substantial preliminary showing that the affidavits in support of the warrants intentionally or recklessly contained material falsities and omitted a material fact. The Court concludes the alleged falsities and omissions are not material in that, with the alleged falsities stricken and the alleged omission included, there remains a fair probability that evidence of gambling activity would be found on the searched premises.

As to the search of 3100 Windgap, Duffy Conley contends the affidavit failed to set forth probable cause, the warrants were executed in violation of state law, and the warrants were not issued by a neutral and detached magistrate. None of Duffy Conley's contentions require suppression of the fruits of the Windgap search.

## SEIZURE AND SEARCH OF VIDEO POKER MACHINES

### Factual Background [3]

Twenty-six State applications for search warrants were prepared by Trooper William C. Cunningham of the Pennsylvania State Police on September 22, 1988. *See* Appendix A. Forty-six applications for search warrants were prepared by Detective John Bosetti of the City of Pittsburgh Police on September 22, 1988. *See* Appendix B. Three search warrants were prepared by Trooper William C. Cunningham of the Pennsylvania State Police on November 9, 1988. *See* Appendix C. Three search warrants were prepared by Detective John Bosetti of the City of Pittsburgh Police on December 16, 1988. *See* Appendix D. Finally, three warrants were prepared by Trooper William C. Cunningham of the Pennsylvania State Police on January 27, 1989. *See* Appendix E. Duffy Conley is stipulated, in essence, to have uncontested ownership of the video poker machines seized and searched pursuant to these warrants. (Document No. 826).

---

**3.** The factual and legal background regarding aspects of the September 1988 raids on locations other than probable cause is found in *Conley,* 856

### The State Warrants

Each of the September 22, 1988 State applications for search warrants contained eight identical pages of "background" information before setting forth the location-specific information in support of probable cause. Specifically, the "background" pages stated:

1. William O. Cunningham, being duly sworn according to law deposes and says: I am a law enforcement officer of the Commonwealth of Pennsylvania within the meaning of Section 5702, Title 18 Pa.C.S. and as such, am empowered to make arrest for criminal offenses enumerated in Title 18 Pa.C.S. I have been a Pennsylvania State Policeman since 1968 and I am presently assigned to the Bureau of Criminal Investigation, Western Task Force Crime Unit. In the past two years I have initiated or participated in the seizure of in excess of five hundred electronic gambling devises, including Draw Poker, Hi–Low Joker Poler [sic], Riverboat Poker, Top Draw Poker, Draw 80 Poker, Jackpot Bonus Poker, and Casino Games within the Commonwealth of Pennsylvania. During the seizure of over three hundred poker machines in Northeast Pennsylvania in 1988 this officer was shown various methods used by manufacturers and vendors of these devices to circumvent Pennsylvania law, such as hidden knock off switches and pay out meters and how to ascertain the internal bookeeping [sic] on these devices by Trp. James Girard, a qualified expert in gambling prosecutions in nine different counties in Pennsylvania.

2. *Video Display and Electronic Gambling Devices Defined*

We know electronic video display gambling devices are distinctive by nature and bare [sic] several identifying characteristics which preclude them from being classified as amusement devices. These electronic devices are an extension of the mechanical slot machine, using computer-randomizing technology to create electronic

F.Supp. at 1014–1026 (W.D.Pa.1994) (Document No. 801).

"reels:" [sic] which introduce the element of chance previously provided by mechanical reels or drums in the earlier devices. Similarly video display gambling devices contain EPROMs (computer chips) which program printed circuit boards to display games of chance including, but not limited to, draw poler [sic] and black jack card games. The cards displayed on the video screen are dealt randomly and electronically by the device, eliminating any skill factor on the part of the player.

We have found through inspecting electronic and video display gambling devices and during our experiences in the Pennsylvania Courts of Common Pleas, that the following characteristics are synonymous with gambling devices.

A. *KNOCK–OFF FEATURE*—These are used only on gambling devices and are used to remove accumulated credits for the following reasons. When players are reimbursed for unused credits, it is essential that the unused credits be removed to prevent subsequent players from being reimbursed for those accumulated credits. The knock-off feature is also an element of an accounting function which provides the operator with a method for recording the unused credits for which the player is reimbursed. These knock-off features are often disguised or hidden with [sic] these devices to avoid detection by law enforcement. Video display gambling devices are equipped at the manufacturer with a built-in knock down device on the electronic circuit board.

Distributors or vendors may try to hide the knock down features through various disguises such as magnetic switches, remote control devices, or hidden buttons; but, our experience inspecting the machine has shown the knockdown feature connot [sic] be removed from the electronic circuit board.

B. *METERS*—Manual meters are often found inside these gambling devices to record the number of coins inserted into the device. A second meter is often found to record the number of credits "knocked off" or removed from display numbers on the video screen. The newer model gambling devices display these numbers on the video screen (accounting display or bookkeeping). This coded feature maintains the confidentiality of the knock-off data. These meters usually contain at least six (6) figures which show that [sic] these devises have the ability to accumulate an inordinate number of credits.

C. *POWER INTERRUPT CIRCUIT*—Most video display gambling devices and electronic gambling devices have a circuit which is activated when a power failure occurs. Without this power interrupt circuit, all accumulated credits recorded on the credit display meter would be removed when a power failure occurs and the power is then restored. Since a credit and a coin (usually .25 cents [sic] ) are of the same value, loss of credit would represent a large financial loss to the player.

D. *MULTIPLE COIN FEATURE*—Often these devices have multiple coin feature which allows the player to deposit several coins before play begins or which allows the player to add coins during play to increase his or her odds of winning additional credits. These coins are transmitted into credits and are recorded on a credit meter. The credits are then used to increase the wager on a feature or to increase the chances of winning additional credits on a special feature.

E. *DIP SWITCHES*—Dip switches are also an integral part of these gambling devices and are used to vary the number of coins per credit, the points awardable, the odds, the maximum wager per hand, or the type of game.

F. *VARIABLE ODDS*—This is another characteristic of these devices that allows the possessor or vendor to change player odds or set the device at a disadvantage to the player.

G. *ACCUMULATE AN INORDINATE NUMBER OF CREDITS*—These devices all have the ability to accumulate an inordinate number of credits, usually 9,999 and have the ability to carry over credits won on a previous game to wager on at a later game.

H. *TIME OF PLAY*—The time of play on these devices is characteristically short

in duration. The player cannot alter the time cycle once the game is activated. The length of play is determined by the device.

I. *NON–SKILL*—These devices are of a non-skill nature and are based wholly or predominantly on chance, which would preclude the ability of a player from significantly affecting the outcome of play. Draw poker and black-jack are examples of the types of games which may be played on video display gambling devices for consideration of twenty-five cents. Althought [sic] knowledge of how the game of poker or black-jack maybe [sic] used to hold over certain cards the ultimate "reeling" of the electronic circuitry within the device to produce any winning or non-winning combination of cards is strictly up to the device. There is no interaction on the part of the player with the device relative to game strategy, deception, card mathematics, psychology, or courage in betting or raising as in a poker game with individuals.

*VIDEO DISPLAY AND ELECTRONIC GAMBLING DEVICE DISTRIBUTORS DEFINED*

We have further learned through previous investigation, seizure of gambling devices, and interviews with those in control of the device, that machine vendors and distributors solicit various locations such as taprooms, social clubs, and other business [sic] for the purpose of gambling device placement as well as legitimate vending machine placements. During the solicitation of placement by the distributor with the business location, such matters as device servicing, money collection, and "credits paid off" on the devices by the club or bar (usually $10.00 on 40 credits or over) a 50–50 split is then made of the accumulated quarters played on the device. [sic] Half for the distributor and half for the business location. Accounting meters within the devices, which record the num-

ber of credits "knocked off" the device, then come into importance. This is used as a check on how many credits were won on the device and a corresponding check on the bartenders [sic] record. Usually the machine distributor has the only access to the coin box or the area of the recording meters within the device.

3. As a member of the Pennsylvania State Police, I am empowered by law to conduct investigations of and make arrests for offenses involving violations of the Pennsylvania Gambling Laws. I have personally participated in the Investigation described herein. The Probable cause set forth in this affidavit is based on my personal investigation described herein, information received from Trooper L. Parker, Tpr. R. Conrad, Tpr. L. Graber, Trp. R. Kutch, Tpr. M. Rogers, and Cpl. J. Poydence he/she [sic], Bureau of Criminal Investigation, Organized Crime Unit West.

*E.g.*, DEF'T 1-0-2 at pp. 1–8. The State warrants of November 9, 1988 and January 27, 1989 also rely on "background" substantially similar to the "background" quoted above.

Following the "background" portion of the affidavit, each affidavit sets forth location-specific information. That is, each warrant included the facts gathered in the course of the investigation relating to the location for which the warrant was sought, in addition to the "background" information.

Each State affidavit sets forth at least one instance of a trooper receiving or witnessing a pay-off on a video poker machine, and the use of a knock-off device to remove the credits accumulated on the video poker machine.[4] Each state warrant contained additional information regarding the circumstances of the pay-off as well. The types of additional information included observation of location employees keeping written records of pay-

---

4. Only twelve of the thirty-two State affidavits relate trooper's receiving or witnessing more than one pay-off and knock-off: Ace's Tavern, GOV'T 88(b); American Legion Post 82 (11–9–88), GOV'T W–14; Carol Ann's Corner Store, DEF'T 1–N–1; The Coffee Pot Restaurant (1–27–89), GOV'T W–20; Gary's Bar & Hotel, DEF'T 1-0–5; Gary's Bar & Hotel (11–9–88), GOV'T W– 15; Max's Place, DEF'T 1-0–16; McKees Rocks Social Club, GOV'T W–8; McKees Rocks Social Club (11–9–88), GOV'T W–16; McKees Rocks Social Club, GOV'T W–21 (1–27–89); Pizza Roma, GOV'T W–11; Terry's Snack Shop (1–27–89), GOV'T W–22. The remaining twenty affidavits relate only a single pay-off and knock-off.

offs in addition to the electronic records generated by the machines, observation of the source of the pay-offs, *i.e.*, from the money in the machines, a cash register, a segregated source of funds, the machine's attendant or funds from an unknown source, and incriminating statements made by location employees. Few, if any, of the warrants contained all types of information.

Further, each of the location-specific portions of the affidavits state that an officer entered the location several days before the application for search warrant was made and observed video poker machines in operation.[5]

Following the location-specific information, each of the State applications for search warrant contained a boilerplate conclusion, which stated:

> To conclude, on each visit troopers played the video poker machines at random at the above establishment. As a result, troopers played random machines on different occasions. Troopers were never directed to any particular video poker machine, which says that one machine pays-off [sic] and other machines are for amusement only and do not pay-off [sic]. Troopers never heard in the above establishment another patron/player directed to any particular video poker machine for the same purpose. On each visit where troopers either accumulated a sufficient amount of credits on the video poker machine, or they witnessed a patron/player accumulate a sufficient number of credits for a pay-off. [sic] Neither the trooper nor the patron/player were never [sic] refused or denied a cash pay-off. Based on the above information, this affiant concludes that all of the video poker machinesat [sic] the establishment

are being used as gambling devices and should be seized as contraband.

*E.g.*, DEF'T 1–0–2 at p. 10.

### The City of Pittsburgh Affidavits

The affidavits accompanying the City applications for search warrants also contained a "background" section that was repeated in each application. The City affidavits substitute the qualifications of Detective Bosetti for those of Trooper Cunningham. Otherwise, with the exception of style and grammar, the State and City "background" sections of the affidavits are the same in all material respects.

Each City affidavit states officers received and/or witnessed two or more pay-offs on different visits to the location, and the use of a knock-off device to remove the accumulated credits subject to the pay-offs. The City affidavits contain additional information akin to that included in the State affidavits.

Further, each of the location-specific portions of the affidavits states that an officer entered the location several days before the application for search warrant was made and observed video poker machines in operation.[6] In addition, twenty-four of the City affidavits relate at least one pay-off and knock-off between September 9, 1988 and September 20, 1988.[7]

### Discussion

#### Request for Franks Hearing

■ In *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court provided a limited opportunity for a defendant to challenge the truthfulness of an affiant's statements in an affidavit of probable case. The Court held:

---

**5.** In the case of the September 22, 1988 warrants, all of the affidavits indicated that the last visit to the location occurred on September 19, 1988.

**6.** In the case of the September 22, 1988 warrants, the vast majority of the affidavits indicated that this last visit to the location occurred on September 20, 1988.

**7.** September 1988 pay-offs and knock-offs occurred in the following locations: Ambrogio Restaurant, DEF'T 1–Q–30; Beechview Laundromat, GOV'T W–1; Big Z, DEF'T 1–Q–36; Bir-

mingham Inn, DEF'T 1–Q–14; Carl's Restaurant & Deli, DEF'T 1–M; Centre Avenue News, DEF'T 1–Q–13; D.J. Browns, DEF'T 1–Q–15; Giant Foods, DEF'T 1–Q–32; Isaly's, GOV'T W–3; Jack's Tavern, DEF'T 1–Q–17; Jims News Stand, DEF'T 1–Q–18; Joel's, DEF'T 1–Q–19; Metro Pizza, DEF'T 1–Q–24; North Shore Deli, DEF'T 1–Q–7; Pasta Too, DEF'T 1–Q–34; Rich's Carrick Cafe, DEF'T 1–Q–5; Riverside, DEF'T 1–Q–27; Roadster's, DEF'T 1–Q–27; Ron's Bloomfield Snack Shop, GOV'T W–4; Scooters, DEF'T 1–Q–4; Shadeland Pub, DEF'T 1–Q–3; Sunny Farms Deli, DEF'T 1–Q–39; West Liberty News, DEF'T 1–Q–1; and White Tower, DEF'T 1–Q–8.

[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affiant's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Id.* at 155–56, 98 S.Ct. at 2676–77. The Court emphasized that "the rule announced ... has a limited scope, both in regard to when exclusion of the seized evidence is mandated, and when a hearing on allegations of misstatements must be accorded." *Id.* at 167, 98 S.Ct. at 2682. At the conclusion of the Opinion, the Supreme Court again emphasized the limitations on the rule, stating:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the

subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth amendments, to his hearing.

*Id.* at 171–72, 98 S.Ct. at 2684. In order to prevail in the end, a defendant "must show *both* that bad faith or reckless disregard existed on the part of the affiant, *and* that there would have been no probable cause but for the incorrect statement." *United States v. Frost,* 999 F.2d 737, 743 (3d Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 573, 126 L.Ed.2d 472 (1993). Bad faith or reckless disregard for the truth comprises the omission of material information, as well as affirmative untruths. *Id.* at 743 n. 2; *United States v. Calisto,* 838 F.2d 711, 714–16 (3d Cir.1988).

### The State Affidavits

#### *The Boilerplate Conclusion*

The majority of the State affidavits were single pay-off affidavits, relating only either a single pay-off to a state trooper or a single visit by a state trooper to the location during which one or more pay-offs to patrons were observed. *See supra,* note 4. In addition, each location-specific section of the single pay-off affidavits concluded by stating that an officer entered the location several days before the affidavit in support of the application for search warrant was signed and observed video poker machines in operation. Duffy Conley contends that, as to the single pay-off affidavits, the boilerplate conclusion contains material falsehoods, to wit, that troopers played the video poker machines on more than one occasion and either received or witnessed a pay-off immediately prior to the application for search warrants.

The boilerplate conclusion states that "on *each* visit troopers *played* the video poker machines at random at the above establishment. As a result, troopers *played* random machines on *different* occasions." (emphasis added). Two sentences after that statement,

the boilerplate conclusion states, "On *each* visit *where* troopers either accumulated a sufficient amount of credits on the video poker machine, or they witnessed a patron/player accumulate a sufficient number of credits for a pay-off. [sic] Neither the trooper nor the patron/player were never [sic] refused or denied a cash pay-off." (emphasis added).

In context, the facts recited in the affidavits clearly support an inference that troopers received or witnessed pay-offs several days before the signing of the affidavit. The boilerplate conclusion affirmatively states that troopers played the machines on *each* visit. The single pay-off affidavits relate only two visits, the last of which was several days before the signing of the affidavit. While the boilerplate conclusion's statement regarding the lack of refusal of pay-offs to troopers is limited to "each visit where" sufficient credits were accumulated, the clear inference from the circumstances thus related is that pay-offs were received or witnessed on more than one occasion, including several days before the signing of the affidavit. If the pay-off to troopers as related in the location-specific section of the affidavit were the only pay-off to troopers, the "each visit where" limitation would be meaningless. Similarly, where the location-specific section of the affidavit relates only a pay-off to a patron, reference to troopers not being denied pay-offs for sufficient credits would be meaningless—unless the trooper were paid off for playing machines during the visit immediately prior to the signing of the affidavit.[8]

The Government urges the Court to find that at most Duffy Conley has shown that the affidavit contains an innocent or negligent inclusion of a contradiction, which would have been readily apparent to the issuing authority.[9] As the Court understands the Government's argument, it asks the Court to assume that the issuing authority deemed the instances of pay-offs related in the location-specific sections to be the only instances of pay-offs worthy of being considered.

Under the standard of review this Court must apply to the issuing authority's finding of probable cause, *see United States v. Conley*, 4 F.3d 1200, 1204–05 (3d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1218, 127 L.Ed.2d 564 (1994); *United States v. Williams*, 3 F.3d 69, 72 (3d Cir.1993), the Court is constrained to reject the position urged by the Government. Unless the Court finds the facts and inferences in the boilerplate conclusion to be unnecessary to probable cause or false after a full blown *Franks* hearing, the Court is bound to accept them as true. Though it is possible that the issuing authority rejected the additional facts in the boilerplate conclusion as contradictory, the point is the facts there set forth, and not stricken by the issuing authority, permitted an inference that gambling had recently been observed at each location. Assuming the additional facts asserted in the boilerplate conclusion are true, the deferential standard of review compels the Court to accept the circumstantial inference that pay-offs were received or witnessed several days prior to the signing of the affidavit.[10]

As evidence of the falsity of the boilerplate conclusion, Duffy Conley cites the contradictory nature of the affidavits and the affiant's testimony in previous proceedings to the effect that the visits in September 1988 were observational only. As evidence of intentional or reckless inclusion of the falsities, he cites the affiant's actual knowledge of the true state of affairs and the clearly critical importance of pay-offs within a few days of the signing of the affidavit. While the Government does not contend that troopers played poker machines or received or wit-

---

**8.** Some, but not all, of the City affidavits also contained boilerplate conclusions similar to those in the State affidavits. The multiple pay-offs and knock-offs related in the City affidavits distinguish the City affidavits. Implicitly recognizing this, Duffy Conley does not contend that the conclusions in such City affidavits are false.

**9.** The "background" information and the boilerplate conclusion were typed in all upper-case letters, whereas the location-specific sections were typed in the standard mix of upper-case and lower-case letters.

**10.** The Court notes that each of the State Search Warrants themselves list as the "date of offense" the date of the pay-off related in the location-specific section of the affidavit followed by "Divers other dates 1988."

nessed pay-offs in mid-September, 1988, it does contend that the boilerplate conclusion does not technically indicate that such pay-offs were made—a contention that the Court rejected above. The Government further challenges the sufficiency of Duffy Conley's proffer of falsity and of recklessness or intent of the affiant.

The Court has its concerns about the affiant's inclusion of boilerplate that appears to be affirmatively false in certain regards, *e.g.,* "troopers played random machines on different occasions," and to include evidence persuasively slanted—lawyer-like—to support a circumstantial inference that the affiant may well have known to be untrue. Nonetheless, the Court need not address these issues if the falsities are not material to probable cause.

### The Mobility of the Machines

Duffy Conley contends the affidavits omitted material information, to wit, that poker machines are mobile by nature and are frequently moved from locations for repair or transfer to other locations. The Government does not contend that poker machines are immobile. In fact, the Government asserts that the issuing authority, through the exercise of common sense, would assume that poker machines are mobile.

The Government challenges Duffy Conley's proffer regarding the affiant's knowledge of the frequency of the movements of poker machines at the specific locations. More fundamentally, the Government contends that Duffy Conley's focus on particular machines upon which pay-offs were made is ill-conceived, given that both gambling devices and gambling *activity* are illegal.

Duffy Conley's proffer relative to the affiant's knowledge of the frequency machine movements is inadequate. His proffer does not indicate how often the machines were moved, let alone whether the affiant knew this undisclosed frequency. The only testimony elicited from the affiant during prior proceedings reflects no more than the common sense understanding of the poker machine mobility the Government urges the Court to attribute to the issuing authority. The Court, however, need not rely solely upon the inadequacy of Duffy Conley's proffer because the Government's point about gambling activity is well taken and the frequency of poker machine movements is not material to probable cause.

### Materiality

■ If an affidavit of probable cause still sets forth probable cause with the alleged falsities omitted and the alleged omissions included, the alleged falsities and omissions are not material. In such circumstances, the warrant is valid and a defendant is not entitled to a *Franks* hearing to determine the truth of the non-essential facts included in or omitted from the warrant. *Franks,* 438 U.S. at 171–72, 98 S.Ct. at 2684–85; *Frost,* 999 F.2d at 743.

■ Probable cause is to be determined under the totality of the circumstances. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). The determination of probable cause entails "a practical, common sense decision whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and the 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.*[11]

The Court of Appeals for the Third Circuit has recently summarized the law regarding the age or "staleness" of information con-

---

11. It is not clear to the Court what standard of review is applicable to the hypothetical warrant in a *Franks* context. Materiality is determined after the defendant has made a substantial preliminary showing of deliberate or reckless falsehood and the defendant's showing is either assumed true to avoid a *Franks* hearing or proven after such a hearing. The issuing authority did not review the hypothetical warrant that the Court reviews. It strikes the Court as logical that the affiant would forfeit the deference afforded the magistrate's determination of probable cause because it is either assumed or proven that the magistrate has been mislead. But, because the Court finds probable cause exists under *Gates* in these circumstances, it need not decide whether the appropriate standard is a "fair probability" or the more deferential "substantial basis for concluding" that a fair probability exists.

tained in an affidavit of probable cause. The Court of Appeals stated:

> Age of the information supporting a warrant application is a factor in determining probable cause. *See United States v. Forsythe,* 560 F.2d 1127, 1132 & n. 6 (3d Cir.1977); *see also United States v. McNeese,* 901 F.2d 585, 596 (7th Cir.1990). If too old, the information is stale, and probable cause may no longer exist. *McNeese,* 901 F.2d at 596. Age alone, however, does not determine staleness. "The determination of probable cause is not merely an exercise in counting the days or even months between the facts relied on and the issuance of the warrant." *United States v. Williams,* 897 F.2d 1034, 1039 (10th Cir.1990), *cert. denied,* 500 U.S. 937, 111 S.Ct. 2064, 114 L.Ed.2d 469 (1991). Rather, we must also examine the nature of the crime and the type of evidence. *See United States v. Tehfe,* 722 F.2d 1114, 1119 (3d Cir.1983), *cert. denied,* 466 U.S. 904, 104 S.Ct. 1679, 80 L.Ed.2d 154 (1984); *Forsythe,* 560 F.2d at 1132; *see also United States v. McCall,* 740 F.2d 1331, 1135–36 (4th Cir.1984).

*United States v. Harvey,* 2 F.3d 1318, 1322 (3d Cir.1993); *see also United States v. Stiver,* 9 F.3d 298, 300–01 (3d Cir.1993), *cert. denied,* ___ U.S. ___, 114 S.Ct. 1115, 127 L.Ed.2d 425 (1994).

Duffy Conley's challenge to probable cause is founded on his contention that the pay-offs recited in the affidavits occurred so long before the issuance of the warrants that the information was stale and no longer provided probable cause.[12] The single pay-off affidavits recite a single pay-off between February 3, 1988 and July 26, 1988, and a visit on September 19, 1988 to the location that revealed the presence of poker machines but no pay-offs.

Duffy Conley argues that the information is stale because there is no information indicating the presence of the particular machines on which the earlier pay-offs were made and the September 1988 visits revealed no criminal conduct at the locations. Duffy Conley correctly points out that not all video poker machines are *per se* illegal under Pennsylvania law,[13] and visual inspection of *per se* illegal machines does not reveal their illegal character. In view of this, he contends, the troopers' mere observation of poker machines months after a single pay-off on a machine that may have been moved cannot support a conclusion that there is a continuing course of criminal conduct or a conclusion that the location harbors *per se* an illegal machine.

In contending that probable cause exists, the Government focuses on the information relating to gambling activity, rather than the presence of *per se* illegal video poker machines. The Government contends the affidavits reveal illegal gambling of a nature that is inherently ongoing. Particularly, the Government notes that the machines, whether or not *per se* illegal, allow patrons to play classic gambling games. Further, the Government contends that video poker machines are "of enduring utility" to the location owner. Thus, the mere observation in September, 1988 of poker machines, without any indication that the machines are *per se* illegal, provides a basis for concluding that the gambling activity previously observed was ongoing in September, 1988.

The Court concludes the hypothetical affidavits under review, which do not include the additional facts of the boilerplate conclusion and do include the fact of poker machine mobility, adequately set forth probable cause to seize and search.[14] Duffy Conley makes his argument by referencing three representative affidavits: Musko's Grocery Store,

---

**12.** Although Duffy Conley challenges probable cause in the affidavit as written and in the context of the hypothetical affidavit here under discussion, his facial challenge assumes that the boilerplate conclusion added nothing to the location-specific section.

**13.** *See generally, Commonwealth v. Twelve Dodge City Poker Machines,* 517 Pa. 363, 365–67, 537 A.2d 812, 813–14 (1988); *United States v. Conley,*

833 F.Supp. 1121, 1159–60 (W.D.Pa.1993), *appeal filed on other grounds,* (Sept. 29, 1993); *United States v. Conley,* 813 F.Supp. 372, 379–80 (W.D.Pa.), *rev'd on other grounds,* 4 F.3d 1200 (3d Cir.1993), *cert. denied,* ___ U.S. ___, 114 S.Ct. 1218, 127 L.Ed.2d 564 (1994).

**14.** *A fortiori,* the warrants on their face contain probable cause to seize and search.

Red's Place and the Glass Bottom. In explaining its ruling, the Court will follow suit.

■ In addition to the facts in its "background" section, the affidavit for Musko's Grocery Store states the following location-specific facts: On February 3, 1988, a state trooper played one of the two poker machines on the premises; both poker machines were of a type identified by name in the "background" section as a type previously seized in unrelated gambling raids; the trooper accumulated 40 credits, the usual minimum amount necessary for a pay-off, as indicated in the "background" section; the trooper received a pay-off for his 40 credits from a white male named Sam; Sam pressed three buttons on the play panel and the credits were removed; Sam went to an unknown location in the front of the store to obtain the money for the pay-off; on September 19, 1988, a state trooper saw two operational poker machines in Musko's Grocery store.

Taken as a whole, the affidavit reveals more than simply an isolated pay-off in February followed by the presence of unidentified poker machines in September. The affidavit reveals that Sam used a knock-off mechanism, which the affidavit identifies as a crucial part of the hidden accounting features of *per se* illegal machines. The affidavit further reveals that the accounting features of which the knock-off feature is a part are most important in the context of splitting the profits made on the machine between the location owner and the machine vendor. This serves to indicate not only a basis for believing that the illegal gambling was part of something larger than Musko's Grocery Store, but also that the profit from the gambling activity was of enough utility to the location owner to justify precise accounting. Although the affidavit does not reveal the exact source of the money paid, it does indicate that it did not come from the person of Sam. Rather, suggesting a set procedure, it came from an undisclosed source removed from both Sam and the machine. *Cf. Commonwealth v. Alewine,* 384 Pa.Super. 283, 287, 558 A.2d 542, 544–45 (1989) *alloc. denied,* 524 Pa. 624, 574 A.2d 66 (1990).

The facts disclosed in the affidavit fairly indicate that the February pay-off to the trooper was part of a continuous course of illegal gambling conduct. The mere observation of an equal number of video poker machines in September, therefore, means that it was fairly probable that the illegal gambling conduct at Musko's Grocery Store continued from February through the date of the affidavit.

In addition to the facts in its "background" section, the affidavit for the Glass Bottom states the following location-specific facts: On June 16, 1988, a state trooper observed two poker machines at the Glass Bottom— one Hi–Lo Double–Up Joker Poker and one Top Draw; both machines are listed in the affidavit as types previously seized in unrelated raids; the trooper observed two pay-offs to one patron; the bartender removed the credits from the machine by pressing the buttons on the play panel in an unknown sequence; the pay-off money came from a drawer, which was capable of being locked, underneath and to the right of the cash register; on September 19, 1988, a state trooper saw two operational poker machines in the Glass Bottom.

Under the same analysis employed with respect to Musko's Grocery Store, probable cause exists in the "background" section and the location specific section of the affidavit, with the boilerplate conclusion excluded. In fact, because the affidavit identifies a specific segregated source of pay-offs, the inference is even more supported in the case of the Glass Bottom. The probable cause set forth in the affidavit relating to Red's Place is substantially similar to that in the affidavit relating to the Glass Bottom.

These three affidavits are representative of the single pay-off affidavits, which contain the least amount of information in support of probable cause. Each of the remaining affidavits avers that at least one pay-off was made on a machine containing a knock off feature plus some combination of additional facts indicating that the pay-off was part of a continuing course of illegal gambling conduct and not an isolated incident.

In this context, Duffy Conley's contention that the failure of the affidavits to indicate

the video poker machines were mobile and frequently moved from the locations may be seen in proper perspective. Probable cause does not in any way depend upon the *per se* illegality of the machines observed on September 19, 1988. Moreover, the inference that the gambling activity at one location was part of a larger operation would be strengthened, had the warrants contained information detailing the vendor's frequent switching of machines. The inference that a larger gambling operation is more likely to be continuous is permissible, particularly where the vendor has supplied a location owner with a *per se* illegal machine at least one previous time. Thus, with machine mobility included in the affidavits, probable cause would not have been negated.

### The City of Pittsburgh Affidavits

■ Duffy Conley concedes that the City of Pittsburgh affidavits are stronger in that each sets forth multiple pay-offs and knock-offs. In fact, although he asserted a claim of ownership over the video poker machines seized and searched pursuant to the three December 1988 City of Pittsburgh warrants, *see* Appendix D, he did not list them as challenged warrants in his brief. Moreover, as to the affidavits that set forth pay-offs and knock-offs between September 9, 1988 and September 20, 1988, *see supra*, note 7, he makes no specific argument as to the staleness of probable cause or the omission of poker machine mobility from the affidavits. As to the remainder of the affidavits, he only asserts the omission of poker machine mobility and the related staleness argument. Because the City of Pittsburgh affidavits contain even more support than the State affidavits for the inference of on-going illegal gambling activities, the Court holds that the allege omission of poker machine mobility from the City of Pittsburgh affidavits was not material.

15. Previously, the Court had denied as moot Duffy Conley's challenge to the September 23, 1988 search of 3100 Windgap Avenue on the grounds that no evidence would be introduced that was directly or indirectly derived from the search. *United States v. Conley*, 856 F.Supp. 1014 n. 1, Order of Court at 3 ¶ 8, 5 ¶ 12 (W.D.Pa.1994)

### Conclusions of Law

1. The affidavits in support of the applications for search warrant contained probable cause even when all that Duffy Conley seeks to exclude is excluded and to include is included.

2. Defendant John F. "Duffy" Conley's request for *Franks* hearing must be denied, and his Motion to Suppress Physical Evidence [1988 searches of locations] must be denied.

### 3100 WINDGAP AVENUE [15]

### Findings of Fact

#### "Standing"

1. In September 1988, 3100 Windgap Avenue ("the Windgap premises") was a two-story block building located at the corner of Windgap Avenue and Berry Streets. The upper level was directly accessible from Berry Street. As the ground sloped down away from Berry Street, the lower level was directly accessible from Windgap Avenue.

2. The Windgap premises had two standard-size steel doors. One door, containing a peep hole, was located on the upper level. Another door was located on the lower level. The Windgap premises, being a warehouse on the lower level, also contained a steel garage door, large enough to permit trucks to enter the lower level.

3. When Duffy Conley purchased the Windgap premises, there were three large plate glass windows on the upper level. Curtin replaced the three plate glass windows with glass block windows to obscure the view from the street into the Windgap premises.

4. Duffy Conley owned the Windgap premises and Curtin was the manager of the warehouse on September 23, 1988.

5. There were no signs on the outside of the Windgap premises identifying it with Duffy's Vending. Neither Duffy's Vending

(Document No. 801). Subsequent to said denial, evidence arguably subject to suppression came to light, and the Court vacated its denial as moot of this aspect of Duffy Conley's pretrial motions. *United States v. Conley*, 856 F.Supp. 1010 (W.D.Pa.1994).

nor Duffy Conley advertised or solicited walk-in business at the Windgap location.

6. The upper level of the Windgap premises contained makeshift offices. Duffy Conley and Curtin worked out of such offices and used phones, which were located throughout the Windgap premises.

7. The lower level was divided into two rooms. One room served as warehouse space for Duffy's Vending machines. The other room served as a repair shop for the machines.

8. The upper-level door, containing the peep-hole, was usually kept locked. Inside the upper-level door was a small, makeshift reception area.

9. The lower-level door, which opened into the warehouse portion of the lower level, was always locked. It was used only by employees of Duffy's Vending.

10. The garage door, which also opened into the warehouse portion of the lower level, was usually kept closed except as necessary to accommodate trucks entering, loading and unloading, and exiting.

11. Duffy Conley had a subjective expectation of privacy in the Windgap premises.

*Execution of the Search Warrant*

12. On September 23, 1988, Trooper Kutch and Trooper Gentile, two members of the Pennsylvania State Police in plain clothes but wearing raid jackets bearing the legend "State Police," two uniformed members of the State Police, and several members of the City of Pittsburgh Police executed a search warrant at the Windgap premises.

13. When the law enforcement officers first approached the Windgap premises on September 23, 1988, the garage door was open, and a pick-up truck was partly in the garage.

14. As Trooper Kutch approached the open garage door he asked a young man, who was standing next to the pick-up truck, to direct him to the person in charge.

16. The application for search warrant for the Windgap premises was admitted into evidence as

15. The young man did not respond verbally, but pointed to a woman standing near a desk inside the Windgap premises.

16. Trooper Kutch, accompanied by Trooper Gentile, entered the Windgap premises and approached the desk. Trooper Kutch identified himself to the woman, displayed his badge, informed the woman that he had a search warrant and asked who was in charge.

17. No law enforcement officer knocked and announced his purpose or authority before the troopers entered the premises and approached the woman near the desk.

18. The woman near the desk stated that William Curtin was the manager of the warehouse and that she would summon him for the officers.

19. It is not clear from the record whether Curtin was in the upstairs of the building or absent from the premises at the time the female employee summoned him. Nonetheless, Curtin voluntarily arrived shortly after the employee made a telephone call to him.

20. Trooper Kutch waited at the desk for a few minutes until Curtin arrived. At or near the same time Curtin arrived, a person introduced as Curtin's attorney arrived.

21. Trooper Kutch identified himself, displayed his badge, and served the search warrant on Curtin.

22. Other than entering the premises, the State Police took no further action regarding the execution of the warrant until Curtin arrived. Once Curtin was present, the State Police completed the execution of the search warrant.

23. The entire search of the Windgap premises, conducted solely on the lower level of the building, was completed in approximately 2–3 hours. After the search was completed, Curtin signed the inventory sheet which listed all of the items that had been seized.

*Summary of the Affidavit*

Among the warrants issued to the State Police on September 22, 1988 was the warrant to search the Windgap premises.[16] In

GOV'T 100.

structure, the Windgap affidavit is similar to the other State affidavits, having the same "background" section followed by location-specific information. The Windgap affidavit, however, does not contain the boilerplate conclusion that was included in all of the other State affidavits.

The location-specific portion of the Windgap affidavit states:

3. As a member of the Pennsylvania State Police, I am empowered by law to conduct investigations of and make arrests for offenses involving violations of the Pennsylvania Gambling Laws. I have personally participated in the investigation described herein.

The probable cause set forth in this affidavit is based on my personal participation in the investigation described herein, and information received from Trooper J. Rozum, Tpr. L. Parker, Tpr. R. Conrad, Tpr. L. Graber, Tpr. F. Kutch, Tpr. M. Rogers, Tpr. M. Scherer, and Cpl. J. Poydence, Penna. State Police, Bureau of Criminal Investigation, Organized Crime Unit West.

13 Feb. 1988, Tpr. L. Parker, Penna. State Police while in Terry's Snack Shop, 906 Chartiers Ave., McKees Rocks, Pa., observed Duffy Conley in the establishment going from poker machine to poker machine taking money out of the same, as well as making note of the print out [sic] on the screen that would appear after he pushed a button or switch up under the inside of the machine. After Conley emptied the money from the machines and counted same, he went around from poker machine to poker machine and gave each person that was playing the poker machine $15.00 with Tpr. Parker receiving same in the form of three five dollar bills. Conley stated to Tpr. Parker that he was taking care of his machine business.

19 Mar. 1988, Tpr. L. Parker, Penna. State Police while in Terry's Snack Shop, 906 Chartiers Ave., McKees Rocks, Pa., received a pay-off on a Riviera Poker Machine at 1140 hours after accumulating 40 credits on same for $10.00. Tpr. Parker observed Duffy Conley emptying poker machines of U.S. currency at this time.

29 August 1988 the Affiant, along with Tpr. J. Rozum, Penna. State Police conducted a survillance [sic] on the warehouse and repair shop of John Conley, AKA Duffy Conley, located at the corner of 3rd Ave and 3rd St., Cargnie, [sic] Pa. Upon arrival at the warehouse at 0920 hours both officers observed a yellow 1983 Int. Truck with Pa. Reg. YGO6755 issued in the name of Duffy's Vending, 930 Saw Mill Run Blvd., Pittsburgh, Pa. At this time four men were loading the truck with various types of video machines. At 1010 hours the truck left and was followed to another warehouse located at the corner of Windgap Road [sic] and Berry St., Pittsburgh, Penna. Building is described as a two story cream colored with brown trim cement block building. It appeared to both officers that Duffy Conley was moving his warehouse and repair shop from the address in Cargnie [sic] to the address in Pittsburgh. Several registration plate numbers were taken at the warehouse located in Cargnie, [sic] Pa. and they are as follows: 1986 Ford Truck with Pennsylvania registration YGO67756 which is issued to Duffy Vending, 930 Saw Mill Run Blvd., Pittsburgh, Penna. 15220 and a 1988 Chev. blue in color with car phone and Pennsylvania registration RUN303 which is issued to John Duffy Conley 40A Silver Lane, McKees Rocks, Pa. 15136.

12 Sept 1988 the Affiant checked with the Recorder of Deeds of Allegheny County, Pittsburgh, Penna., and at this time found that the building located at the corner of Windgap Road [sic] and Berry St., in the 28th Ward of the City of Pittsburgh, County of Allegheny, Pa., was obtained by John F. Conley, also known as Duffy Conley from James J. Miley on the 6th day of August 1988 for the sum of $150,000.00. Recorded 17th day of August 1988, in the Recorder's Office of the said County, in deed book, vol. 7850, page 38.

14 Sept 1988, the warehouse located on 3rd Ave and 3rd St., Carnegie, Pa., was checked by Tpr. J. Rozum and Tpr. L. Parker, Penna State Police and at this

time it was found that the warehouse was padlocked and empty.

15 Sept 1988, at 0900 hours, Tpr. J. Rozum, Penna. State Police conducted a survillance [sic] on the warehouse of John Duffy Conley located at the corner of Windgap Road [sic] and Berry St., in the 28th Ward of the City of Pittsburgh, County of Allegheny, Pa., and at this time observed employees of the warehouse loading a green Chev [sic] truck with a number of video machines. Two of the machines were covered with black plastic. Truck left the warehouse at 0930 hours. At this time Tpr. Rozum relayed this information to survillance [sic] teams who followed the trucks to their final destination.

Same date Tpr. Cunningham and Tpr. Rogers followed the Chev truck to the Cousins Bar at 203 Grant Ave., Millvale, Pa., at which time poker machines were observed being delivered to Cousins Bar. Tpr. Cunningham observed a W–M–20's delievery [sic] man from Duffy's giving a W–M–50's believed to be named Jim (employee or owner of Cousins) a cylinder key and saying something to himabout [sic] the key.

15 Sept 1988, Tpr. L. Parker and Tpr. M. Scherer, Penna. State Police entered Cousins Tavern, 203 Grant Ave., Millvale, Pa., and received a pay-off on a [sic] electronic Draw Poker machine. Tpr. Scherer observed four Top Draw electronic poker machines, located along the right hand and rear walls of the bar as you enter the front door. Tpr. Scherer played the Top Draw machine located against the rear wall and accumulated 40 credits and received a pay-off of $10.00 in the formof [sic] two $5.00 bills at 2125 hours. Tpr. Scherer asked the bartender W–M–30's, 5–6, brown hair to cash in the credits. Subject went to a drawer to the left of the cash register and removed the two $5.00 bills laying same on the bar in front of Tpr. Scherer.

19 Sept 1988, Tpr. R. Kutch, Penna. State Police, entered Cousins Tavern, 203 Grant Ave., Millvale, Pa., at 2100 hours and at this time observed two top Draw electronic poker machines being played by patrons. Top Draw machines in same lo-cation as on 15 Sept 1988 and of the same brand name delivered from John Duffy Conley warehouse on 15 Sept 1988.

Is is [sic] this Officers [sic] opinion that John Conley, AKA Duffy Conley's warehouse located at the corner of Windgap Road [sic] and Berry Street in the 28th Ward of the City of Pittsburgh, County of Allegheny, Pa., is maintaining illegal gambling devices per se (poker machines) and is also maintaining illegal gambling devices per se (poker machines) at different locations in Allegheny Co. Therefore this officer feels that probable cause does exist for the issuance of said search warrant for illegal gambling devices per se along with records pertaining to the location of poker machines maintained and serviced by John Duffy Conley or employees of same.

GOV'T 100, at 8–11.

The capias clause of the warrant authorized the seizure of the following:

Illegal Per Se Electronic Video Poker machines (Top Draws, Hi–Lo Joker Poker, Casino Games, Hi–Lo Super Joker Poker and any other brand name poker machines this are [sic] illegal per se) including ALL records from purchasing of machines from the manufacturer & records of sales to customers, all records of bars or other business establishments, and any [sic] having John CONLEY's machines on premises and any computer that may contain records.

*Id.,* Search Warrant.

### Discussion

Duffy Conley first contends that the affidavit failed to set forth probable cause that the items subject to seizure would be located on the premises, or that criminal activity was occurring on the premises. Specifically, he contends that there is no information sufficient to allow an inference of connection between Duffy Conley to the pay-offs or the video poker machines at Cousins Tavern.

█ In the absence of supported allegations invoking *Franks*, the standard of review to be employed in reviewing a search warrant is clear:

"[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Gates,* 462 U.S. at 238, 103 S.Ct. at 2332 (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)). Keeping in mind that the task of the issuing magistrate is simply to determine whether there is a "fair probability that contraband or evidence of a crime will be found in a particular place," *id.,* a reviewing court is to uphold the warrant as long as there is a substantial basis for a fair probability that evidence will be found.

*Conley,* 4 F.3d at 1205.

■ Although the information provided in the Windgap affidavit is not overwhelming, it does provide a substantial basis from which the issuing authority could find a fair probability that the items listed in the capias clause would be found on the premises. The affidavit indicates that Duffy Conley was observed at Terry's Snack Shop in February 1988 collecting money from machines utilizing an on-screen display, which is described in the "background" portion of the affidavit as the ultimate goal of the knock-off and metering features. Moreover, he stated that the machines in question were part of his "machine business." The affidavit also indicates that slightly over one month later, a trooper received a pay-off at Terry's Snack Shop, while Duffy Conley was collecting money at the location.

The affidavit clearly provides a substantial basis for believing that Duffy Conley shifted his poker machine warehousing operations from the Third Street site in Carnegie to the Windgap premises in and around August, 1988. Not only do these averments indicate the present location of Duffy Conley's warehousing operations, they indicate a continuity of operations, notwithstanding the move.

While the affidavit may not contain proof positive that video poker machines were picked-up from the Windgap premises on September 15, 1988 and delivered to Cousins Tavern, such an inference is adequately substantiated in the affidavit's averments. Given that, the pay-off received by a trooper on the same date and the presence of machines of an identical type on September 19, 1988 provide a sufficient basis for believing that Duffy Conley had continued to operate as a machine vendor of illegal *per se* video poker machines as described in the "background" section of the affidavit.

The Windgap affidavit contains sufficient probable cause to believe the items to be seized could be found on the Windgap premises. Evidence derived from the search of the Windgap premises will not be suppressed on that basis.

■ Duffy Conley further contends that all evidence derived from the Windgap search must be suppressed because his rights under Pennsylvania statutory and constitutional law were violated when the state law enforcement personnel entered the Windgap premises without first knocking and announcing their purpose and authority. On the analogous facts developed with respect to the September 23, 1988 search of 930 Saw Mill Run Boulevard, the Court indicated that it was bound by Third Circuit precedent to reject such a theory of suppression. *United States v. Conley,* 856 F.Supp. 1010, 1028–1032 (W.D.Pa.1994) (Document No. 801); *See Stiver,* 9 F.3d at 300, 301–302; *cf. Commonwealth v. Curtin,* 427 Pa.Super. 224, 234–43, 628 A.2d 1132, 1137–41 (1993) (suppressing fruits of the search at issue here on state law grounds). For the same reason it previously articulated, the Court rejects Duffy Conley's assertion of state-secured rights with respect to the execution of the search warrant at the Windgap premises.[17]

Finally, Duffy Conley contends suppression is appropriate because the Windgap warrant was not issued by a neutral and detached magistrate. For clarity's sake, the

---

**17.** To the extent that Duffy Conley challenges the manner of execution under the Fourth Amendment of the Constitution of the United States, the Court finds that the law enforcement officers' conduct was not so unreasonable as to violate the Fourth Amendment. The officers entered an open garage door, asking for the person in charge. While they did invade a constitutionally protected area without knocking and announcing their presence, they did so pursuant to a valid warrant. The raid was conducted in a non-provocative manner during day-light, business hours, and the officers awaited Curtin before continuing the execution of the search warrant.

Court notes here it has previously ruled on this issue and found to the contrary. *United States v. Conley*, 856 F.Supp. 1010, 1022–1026 (W.D.Pa.1994) (Document No. 801).

**Conclusions of Law**

1. The affidavit in support of the search warrant executed on September 23, 1988 at the Windgap premises contained probable cause that the items subject to seizure would be located on the premises.

2. Nothing in the manner in which the law enforcement officers executed the search of the Windgap premises would justify suppression of evidence.

**APPENDIX A**

SEPTEMBER 1988 STATE POLICE SEARCH WARRANTS [18]

| | Location | Exhibit No. |
|---|---|---|
| 1. | 5 & 10 Bar<br>324 Shingiss Street<br>McKees Rocks, PA | DEF'T 1–0–2 |
| 2. | Ace's Tavern<br>716 Broadway Avenue<br>McKees Rocks, PA | GOV'T 88(b) |
| 3. | American Legion Post 82<br>421 Jane Street<br>Carnegie PA | GOV'T 83 |
| 4. | Bishops<br>4707 Campbells Run Road<br>Pittsburgh, Pennsylvania | GOV'T W–5 |
| 5. | Bridge View Inn<br>316 Helen Street<br>McKees Rocks, PA | GOV'T W–6 |
| 6. | Butya's Lounge<br>5540 Steubenville Pike<br>McKees Rocks, PA | GOV'T W–7 |
| 7. | Carol Ann's Corner Store<br>300 Helen Street<br>McKees Rocks, PA | DEF'T 1–N–1 |
| 8. | Coffee Pot Restaurant<br>317 Helen Street<br>McKees Rocks, PA | DEF'T 1–N–3 |
| 9. | Conference Room<br>250 Mt. Lebanon Boulevard<br>Pittsburgh, Pennsylvania | DEF'T 1–N–4 |
| 10. | Cousin's Tavern<br>203 Giant Street<br>Millvale, PA | DEF'T 1–O–1 |
| 11. | Del Kids<br>5536 Steubenville Pike<br>McKees Rocks, PA | DEF'T 1–N–6 |

**18.** The applications for search warrants have come into the record from different sources. During prior proceedings, Duffy Conley introduced into evidence several group exhibits containing some of the warrants here in question. *See* DEF'T 1–M, 1–N, 1–0, & 1–Q. For clarity's sake, the Court has renumbered each individual warrant from group exhibits by adding a number at the end, *e.g.*, 1–N–1, 1–N–2, etc. (Defendant's Exhibit 1–M is a solitary warrant.)

Additionally, the Government introduced several applications for search warrants. These warrants are designated as Government Exhibits by numbers without prefix or suffix.

The Government submitted the balance of the warrants in question with blank "Government Exhibit" stickers on each warrant. The Court has given all the warrants so submitted a "W" prefix and a number, *e.g.*, W–1, W–2. As the Government's "W" exhibits have not formally been admitted into evidence, the Court hereby admits Government Exhibits W–1 through W–34 into evidence.

A number of the City of Pittsburgh applications for search warrants are only partially reproduced in each exhibit. The identical "background" for these warrants is contained in DEF'T 1–Q–43.

SEPTEMBER 1988 STATE POLICE SEARCH WARRANTS

|  | Location | Exhibit No. |
|---|---|---|
| 12. | Gary's Hotel and Bar<br>833 Island Avenue<br>McKees Rocks, PA | DEF'T 1–O–5 |
| 13. | Gino's<br>1021 Chartiers Avenue<br>McKees Rocks, PA | DEF'T 1–O–6 |
| 14. | Glass Bottom<br>362 Helen Street<br>McKees Rocks, PA | DEF'T 1–O–7 |
| 15. | Jim's Hotel & Bar<br>330 Helen Street<br>Etna, PA | DEF'T 1–O–10 |
| 16. | Kennedy's Restaurant<br>1625 Pine Hollow Road<br>McKees Rocks, PA | DEF'T 1–O–13 |
| 17. | Laundry Mat<br>Chartiers & Crawford<br>McKees Rocks, PA | DEF'T 1–O–14 |
| 18. | Max's Place<br>327 Helen Street<br>McKees Rocks, PA | DEF'T 1–O–16 |
| 19. | McKees Rocks Social Club<br>317 1/2 Helen Street<br>McKees Rocks, PA | GOV'T W–8 |
| 20. | Musko's Grocery Store<br>700 Fredericks Street<br>McKees Rocks, PA | GOV'T W–9 |
| 21. | Norwood Inn, Inc.<br>184 McCoy Road<br>McKees Rocks, PA | GOV'T W–10 |
| 22. | Pine Hollow Country Dairy<br>Kenmawr Shopping Plaza<br>McKees Rocks, PA | GOV'T 85 |
| 23. | Pizza Roma<br>8360 Perry Highway<br>Pittsburgh, Pennsylvania | GOV'T W–11 |
| 24. | Potomac Coffee & News<br>1410 Potomac Avenue<br>Pittsburgh, Pennsylvania | GOV'T W–12 |
| 25. | Red's Place<br>704 Thompson Avenue<br>McKees Rocks, PA | GOV'T W–13 |
| 26. | Terry's Snack Shop<br>906 Chartiers Avenue<br>McKees Rocks, PA | GOV'T 86 |

## APPENDIX B

SEPTEMBER 1988 CITY OF PITTSBURGH POLICE SEARCH WARRANTS

| 1. | Ambrogio Restaurant<br>39 Southern Ave.<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–30 |
|---|---|---|
| 2. | Angelo's Pizzeria<br>4826 Liberty Avenue<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–29 |
| 3. | Ardolino's Pizza<br>251 Atwood Street<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–40 |
| 4. | Beechview Laundromat<br>1615 Broadway Avenue<br>Pittsburgh, Pennsylvania | GOV'T W–1 |

SEPTEMBER 1988 CITY OF PITTSBURGH POLICE SEARCH WARRANTS

| | Location | Exhibit No. |
|---|---|---|
| 5. | Big Z<br>961 Liberty Avenue<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–36 |
| 6. | Birmingham Inn<br>1707 E. Carson Street<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–14 |
| 7. | Brownsville Road Restaurant<br>& Deli a/k/a Isaly's<br>2608 Brownsville Road<br>Pittsburgh, Pennsylvania | GOV'T W–2 |
| 8. | Brandy's Restaurant<br>2323 Penn Avenue<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–37 |
| 9. | Carl's Restaurant & Deli<br>1103 Brownsville Road<br>Pittsburgh, Pennsylvania | DEF'T 1–M |
| 10. | Centre Avenue News<br>4637 Centre Avenue<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–13 |
| 11. | City Deli<br>1216 Grandview Avenue<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–42 |
| 12. | The Coffee Shop<br>1001 East Carson Street<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–11 |
| 13. | D.J. Browns<br>615 E. Ohio Street<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–15 |
| 14. | East Park News<br>406 East Ohio Street<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–10 |
| 15. | Fort Necessity<br>1804 East Carson Street<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–12 |
| 16. | G & K Grocery<br>54 Penn Avenue<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–9 |
| 17. | George's Tailor Shop<br>969 Liberty Avenue<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–31 |
| 18. | Giant Foods # 4<br>928 Chartiers Avenue<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–32 |
| 19. | Isaly's<br>4209 Butler Street<br>Pittsburgh, PA | GOV'T W–3 |
| 20. | Jack's Tavern<br>1121 East Carson Street<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–17 |
| 21. | Jim Millers<br>2111 Perrysville Avenue<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–35 |
| 22. | Jims News Stand<br>212 1/2 Tenth Street<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–18 |
| 23. | Joel's<br>510 East Ohio Street<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–19 |
| 24. | Kail's Coffee Shop<br>304 Ross Street<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–20 |

**1054**

| | Location | Exhibit No. |
|---|---|---|
| 25. | M & S Cafe<br>709 East Street<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–21 |
| 26. | Mandy's Pizza<br>903 East Street<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–22 |
| 27. | Mandy's Pizza<br>3904 Perrysville Ave<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–23 |
| 28. | Metro Pizza<br>200 Shiloh Street<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–24 |
| 29. | New Stones Saloon<br>2901 Sarah Street<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–25 |
| 30. | North Shore Deli<br>619 East Ohio Street<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–7 |
| 31. | O'Leary's Donut Shop<br>1412 East Carson Street<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–43 |
| 32. | Papa John's<br>424 East Ohio Street<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–6 |
| 33. | Pasta Too<br>1106 Federal Street<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–34 |
| 34. | Rich's Carrick Cafe<br>2002 Brownsville Road<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–5 |
| 35. | Riverside<br>3337 West Carson Street<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–27 |
| 36. | Roadster's<br>130 North Negley Avenue<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–41 |
| 37. | Roma Hotel<br>1211 Penn Avenue<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–28 |
| 38. | Ron's Bloomfield Snack Shop<br>4613 Liberty Avenue<br>Pittsburgh, Pennsylvania | GOV'T W–4 |
| 39. | Scooters<br>412 Greentree Road<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–4 |
| 40. | Shadeland Pub<br>3037 Shadeland Avenue<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–3 |
| 41. | Sonny's Place<br>309 Shiloh Street<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–2 |
| 42. | Sunny Farms Deli<br>600 Brookline Boulevard<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–39 |
| 43. | West Liberty News<br>2409 West Liberty Avenue<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–1 |
| 44. | White Tower<br>129 Sixth Street<br>Pittsburgh, Pennsylvania | DEF'T 1–Q–8 |

SEPTEMBER 1988 CITY OF PITTSBURGH POLICE SEARCH WARRANTS

| | Location | Exhibit No. |
|---|---|---|
| 45. | Windgap Tavern | DEF'T 1–Q–33 |
| | 3840 Chartiers Avenue | |
| | Pittsburgh, Pennsylvania | |
| 46. | Wise's Lounge | DEF'T 1–Q–38 |
| | 2315 Noblestown Road | |
| | Pittsburgh, Pennsylvania | |

APPENDIX C

NOVEMBER 1988 STATE POLICE SEARCH WARRANTS

| | | |
|---|---|---|
| 1. | American Legion Post 82 | GOV'T W–14 |
| | 421 Jane Street | |
| | Carnegie PA | |
| 2. | Gary's Hotel & Bar | GOV'T W–15 |
| | 833 Island Avenue | |
| | McKees Rocks, PA | |
| 3. | McKees Rocks Social Club | GOV'T W–16 |
| | 317 1/2 Helen Street | |
| | McKees Rocks, PA | |

APPENDIX D

DECEMBER 1989 CITY OF PITTSBURGH POLICE SEARCH WARRANTS

| | | |
|---|---|---|
| 1. | Angelo's Pizza | GOV'T W–17 |
| | 4826 Liberty Avenue | |
| | Pittsburgh, PA | |
| 2. | Giant Food | GOV'T W–18 |
| | 928 Chartiers Avenue | |
| | Pittsburgh, PA | |
| 3. | Liberty Tavern | GOV'T W–19 |
| | 972 Liberty Avenue | |
| | Pittsburgh, PA | |

APPENDIX E

JANUARY 1989 STATE POLICE SEARCH WARRANTS

| | | |
|---|---|---|
| 1. | Coffee Pot Restaurant | GOV'T W–20 |
| | 317 Helen Street | |
| | McKees Rocks, PA | |
| 2. | McKees Rocks Social Club | GOV'T W–21 |
| | 317 1/2 Helen Street | |
| | McKees Rocks, PA | |
| 3. | Terry's Snack Shop | GOV'T W–22 |
| | 906 Chartiers Avenue | |
| | McKees Rocks, PA | |

---

### ORDER OF COURT

AND NOW this 31st day of May, 1994, upon consideration of the Court's Memorandum Opinion of even date, it is hereby ORDERED as follows:

(1) Pretrial Motions of John F. "Duffy" Conley: Motion to Suppress [1988 searches of locations as listed in Document No. 826, at 1–10] (Document No. 377, in part) is DENIED;

(2) Pretrial Motions of John F. "Duffy" Conley: Defendant's Motion to Suppress: [September 1988 search of 3100 Windgap Avenue] (Document No. 377, in part) is DENIED.